The New York Medical College and Hospital for Women, Plaintiff, *v.* William H. Dieffenbach and Others, Defendants.

Supreme Court, New York County, September 30, 1925.

Schools — medical colleges — action to set aside transfer on foreclosure and for accounting — trustees, through conspiracy, permitted mortgage to be foreclosed — plan was to rid institution of educational feature and conduct hospital only — property was purchased by dummy of trustees with money furnished by them — purchaser transferred property to new hospital corporation having same trustees — trustees were removed and present action was instituted by new trustees — good faith in defendants not shown — good faith not defense to illegal action — defense that action is collateral attack on foreclosure not valid — bonds secured by mortgage were controlled by trustees — defendants could not refuse to pay interest and then foreclose for their own benefit — revocation of registration as medical college not defense — plaintiff entitled to have property restored — rules for accounting stated.

The plaintiff is entitled to a judgment against the individual defendants and the defendant hospital compelling the return to the plaintiff of its property which is now held by the defendant hospital, since it appears that the individual defendants who were trustees of the plaintiff, a hospital and educational institution, for the purpose of ridding themselves of the responsibility of maintaining the educational part of the institution, entered into a conspiracy to transfer the property to a new hospital corporation of which they were to be trustees, and for the purpose of carrying out that conspiracy they caused a default to be made in the payment of interest on a mortgage securing bonds, most of which were held by the trustees, notwithstanding that the corporation had money enough to pay the interest; that they then procured the foreclosure of the mortgage, caused the plaintiff to default in the foreclosure proceeding, and procured a dummy representing them to purchase the property on foreclosure and to pay therefor with money furnished by them; that thereafter the purchaser transferred the property without consideration to the new hospital corporation formed by the trustees of the plaintiff, and later transferred to the same hospital corporation the personal property of the plaintiff which the dummy had acquired apparently in settlement of a loan made by him to the plaintiff; that the trustees then stopped the operation of the plaintiff as a hospital and educational institution, but continued to use the property for hospital purposes

through the means of the new corporation; and that the trustees were then removed from office and new trustees were appointed who commenced the present action.

The individual defendants have failed to show good faith in the transactions outlined, and, in fact, the evidence establishes that they were not proceeding in good faith in carrying out any of the transactions but were acting for their own selfish interests.

Furthermore, the trustees violated section 63 of the Education Law which provides for the method of dissolving an educational and hospital corporation.

The contention that this action is irregular because it is a collateral attack upon the legality of the foreclosure proceedings is without merit.

The objection that if the trustees had paid the interest on the mortgage a preference would have been created to the exclusion of other creditors is without merit, and furthermore, the court cannot overlook the fact that the great majority of the bonds secured by the mortgage were controlled by the trustees, and that their conduct in refusing to pay the interest and causing the foreclosure of the mortgage was a violation of their trust.

The fact that the State Department of Education has revoked the registration of the plaintiff as a medical college is not a defense to this action, since said revocation was brought about solely by the acts of the individual defendants in discontinuing the educational features of the plaintiff corporation and said revocation did not in any way revoke the charter of the plaintiff which is still in existence.

The principles which govern on an accounting which is directed are, that the plaintiff is entitled to restitution of the real and personal property forthwith from the defendant hospital; that any debts of the plaintiff in the form of principal which the defendants have paid must be charged to the plaintiff with interest, only to the time of the foreclosure sale; that interest upon the mortgages or other debts paid by the defendants from the time the plaintiff was divested of its property should not be charged against the plaintiff, and that the defendants should account for all the profits arising from the conduct and operation of the property down to the time of the interlocutory judgment granted herein.

ACTION to set aside as fraudulent and void certain transfers of real and personal property to the defendant The Community Hospital, accomplished by the acts and conduct of the individual defendants, and for an accounting.

*Putney, Twombly & Putney* [*I. Maurice Wormser* and *Henry B. Twombly* of counsel], for the plaintiff.

*Blauvelt & Warren* [*Joseph A. Warren* of counsel], for the defendant Dieffenbach.

*David M. Neuberger*, for the defendant Storer.

*Frank E. Laughran*, for the defendants Lamb and Upton.

*Higley, Sherman & Booth*, for the defendant Yawger.

*Lee, Smyth, Aron & Wise*, for the defendant Scheel.

*Baldwin, Hutchins & Todd* [*Hiram C. Todd* of counsel], for the defendant Pfeiffer.

*John P. Carroll,* for the defendants Walter G. Crump and Eudora Crump.

*Hunt, Hill & Betts,* for the defendant Dominick.

LEVY, J.:

The plaintiff was incorporated by special act of the Legislature to conduct a medical college for women. Subsequently, its powers were enlarged to include the maintenance of a hospital, and the Regents of the University of the State of New York became possessed of jurisdiction over it as if its charter had been granted by them. For many years it was the only institution in which women were afforded the opportunity to obtain a medical education. Its hospital service and clinics were a necessary adjunct for the proper conduct of its educational activities, and furnished clinical observation and practice opportunities for the students and hospital facilities for the members of the teaching staff, both in their educational endeavors for the benefit of the medical school and in connection with their private patients. True it is that at the present day several colleges in this State permit matriculation by women for the study of medicine, but at that time there was indeed a very adequate and laudable purpose in establishing this college, and except for rather good reason it should not have been dissolved save perhaps by legal method. It is wholly needless, therefore, to speak in commendation of those public-spirited persons who in the interest of advanced higher or professional education originated the plan and fathered the procedure.

The institution was registered with the University of the State of New York as maintaining the high standard necessary for the admission of graduates to the State examinations for license to practice medicine. In 1916 the Regents demanded of the college more clinical conveniences, in order to enable it to maintain the increasing high educational standards required of candidates for medical license in this State, whereupon certain additional real property and equipment were purchased, so that in 1917 the aggregate gross value of the property of the institution was approximately $200,000, subject to first mortgages aggregating but $45,000. In that year the college, like so many quasi-public educational institutions, found itself pressed by current financial obligations, and to meet these it raised a second mortgage on its property in the sum of $35,000 payable by October 1, 1927, with interest at six per cent per annum, payable semi-annually. The loan was floated by the issue of corporate bonds secured by the said mortgage, Howard B. Vannote, deceased, the then secretary of the plaintiff, acting as trustee for the bondholders, of whom he and the other members of

the board of trustees constituted the majority. The mortgage provided that in case of default in the payment of interest for three months, the said trustees might upon the request of the holders of fifty per cent of the bonds outstanding, declare the entire principal due at once.

In May, 1918, the trustees becoming weary, as it is claimed, of the task of raising money to meet the deficits, conceived a plan for ridding themselves of the burden without losing the benefit of the position which they held and the advantages which it offered. The hospital being conducted on more or less commercial lines, was at least self-supporting; the college, like other educational institutions of its kind, was not. If the college could be eliminated the hospital would remain, and leave to the medical trustees the benefits which hospital connections were likely to bring them in their private practice. As a first step in carrying out the plan that seemed to have been born in the minds of the defendants Dieffenbach, Storer and the late Vannote — although they attribute it to " legal advice " readily furnished by one of the board, Hamilton R. Squier, a lawyer, now deceased — the trustees voted to discontinue the educational feature. When the fall term of 1918 opened, there was no college, but only a hospital, and in order to end the seemingly equivocal situation, the trustees in further pursuance of their plan decided to default in the payment of interest on the second mortgage, amounting to but $1,050, although, as I am convinced, there were ample means to meet this, and to prosecute what appears to me as a collusive foreclosure after the expiration of the three months' period of grace.

The complaint was signed by Vannote, who seemed to be functioning as a sort of Jekyl and Hyde, as trustee for the college and also as trustee for the bondholders. In the latter capacity he helped to determine to foreclose; in the former, he aided in the decision not to defend. As a consequence, no answer was served by the trustees, and the property was sold at foreclosure at a price of $43,500 above the prior mortgage or the sum of $6,000 more than the principal and interest due upon the second mortgage, the purchaser being the defendant Cassidy, a dummy for the trustees, with funds supplied by the latter. The surplus, after satisfying the obligation due the bondholders, amounting to $5,288.61, was turned over to the defendant Dieffenbach as president of the plaintiff. After the indefensible foreclosure, Cassidy " allowed " the trustees to continue to conduct the hospital and soon thereafter they organized a corporation, known as The Community Hospital in the City of New York, Inc., one of the defendants, to which the very same Cassidy transferred without consideration all the property he had thus acquired at the

Supreme Court, September, 1925. [Vol. 125

foreclosure. The hospital has been continued ever since by the trustees in behalf of the new corporation, except that some of them like Walter G. Crump, very likely for valid reason and in recognition of good conscience, saw fit to disassociate themselves from this contingent.

It may be added that, to further effectuate their designing arrangements, Cassidy also turned over gratuitously all the personalty of the plaintiff valued at something like $20,000, which came to him in a rather remarkable manner. In the fall of 1918, as it is said, he loaned to the plaintiff the sum of $5,000, upon a note secured by a chattel mortgage upon all its personal property. This instrument was never recorded, and before the due date occurred, the plaintiff's trustees executed a bill of sale to Cassidy, ostensibly in satisfaction of the debt, and he in turn conveyed the entire property to the defendant Community Hospital. It is not unlikely that this method of disposing of the personalty was bound up with the general scheme to deprive the plaintiff of its property generally; but this phase of the plan seemed of such a subordinate character that the defendants wholly omitted even the colorful legal forms to validate the attempted transfer. But much more flagrant was their effort to give over to the new corporation the Dominick library together with its $2,000 endowment fund. They ventured to make the gift but did not secure the consent of the original donor, one of the defendants, to this polite form of larceny *de bonis asportatis*, until after the commencement of this action. However, as the property was no longer his, no ratification on his part could put the cloak of respectability upon this positive misappropriation.

The net result of the proceedings thus briefly outlined was that the plaintiff found itself without property and without function. Its trustees by a legerdemain more befitting rapscallionry than a serious group of public servants, succeeded in ridding themselves of a burdensome duty, the furtherance of medical education for women, to devote their full attention to the more convenient self-seeking task of operating a hospital. Was it not Herbert Spencer who declared there is no sane thought or rational act but has its root in egoism? This natural motive influenced as it was by personal interest, prestige, hospital conveniences and the concomitant profit to be derived, became perverted into a form of crass egotism, under the pretended guise of efficiently continuing a public service. And it will not do to have protestation from these medical gentlemen like that of Dr. Dieffenbach, that there is no prestige or advantage in being connected with a small hospital, as this seems to be forcefully contradicted by the very printed regulations of the defendant Community Hospital:

" Patients applying directly for private beds shall be referred by the Superintendent to the Attending Staff for arrangement of professional fees before being admitted." (Page 12, General Rules Community Hospital.)

" Preference [in the assignment of beds] shall be given to patients of the Hospital Staff." (Page 12, Community Hospital Rules.)

" ' Hospital charges ' do not include the professional fees, which are matters of personal arrangement between the patients and the physicians in charge." (Page 13, Community Hospital Rules.)

" Any member of the staff may put a private patient into a ward bed and charge a fee for treatment or operation, provided the Hospital Committee has not assigned these beds as free beds." (Page 14, Community Hospital Rules.)

These and other regulations clearly manifest the undoubted value of the hospital connection to the medical trustees, especially when severed from the responsibility of carrying on the public duty of medical education imposed upon them by the charter, a duty which doubtless meant a tax upon their time and labor, demands upon their experience and skill, and perhaps otherwise. This burden they aimed to shake off and evidently succeeded, and to secure themselves from retribution they determined to continue as trustees, nominally, of the old institution. But they reckoned without the alumnæ of the college and other of its friends, who took energetic measures to have them removed from office by the Regents. It was not until then that they saw the handwriting on the wall, and to avoid the ultimate and inevitable collapse of their well-laid plans, fought all efforts to oust them to the highest court of the State, but without success. They were removed, by reason of their failure to continue to carry out the purpose with which they were solemnly intrusted, and this determination of the State Education Department was unanimously confirmed in certiorari by the Appellate Division of the Third Department (*People ex rel. Diffenbach* v. *Regents, etc.,* 199 App. Div. 55), and sustained by a unanimous Court of Appeals (*People ex rel. Diffenbach* v. *Regents, etc.,* 234 N. Y. 561). The appointment of a new board of trustees by the educational authorities followed, and the present action was brought with a view of righting the wrongs thus previously perpetrated. In fairness, however, to some of the trustees, such as Dr. Crump, Dr. Charles, and some of the non-medical members, the charge of self-aggrandizement cannot be said to apply to that degree, to which it affects those medical trustees who directly or indirectly profited and are still profiting from the results of the scheme of reorganization.

Upon the state of facts here revealed, which in most respects is

**704** N. Y. Med. Col. & Hospital for Women *v.* Dieffenbach.

Supreme Court, September, 1925. [Vol. 125

undisputed, it would seem axiomatic that the plaintiff is entitled to the relief sought, unless the defenses urged raise such legal bars which even a court of equity cannot surmount. It appears that the chief equitable or non-technical defense is that the trustees did not profit by the deal, that they acted in entire good faith, and that the result is of benefit to the public and a realization of some of the beneficent purposes for which the institution was established. Although it may be true that the defendants derived no immediate financial gain except possibly in the payment to themselves, with interest, of the obligations of the plaintiff, nearly every step in the transaction spells bad faith on their part, while the direct financial advantage to some of them is by no means a negligible factor. As for the wholesome result contended for, even if this should be conceded, the situation might be comparable to that of private individuals usurping title to public property and attempting to excuse their violent and presumptuous acts by pointing to the public good which they are accomplishing with it. The trustees of the plaintiff held the property in question in trust for fixed public educational purposes. When these could no longer be carried out adequately and effectively, they were not wholly without remedy to terminate the situation. If they had deemed it wise or necessary to surrender their charter, they could easily have taken steps for dissolution under section 63 of the Education Law (as added by Laws of 1911, chap. 860), whereupon, after payment of the debts, the residue would have vested in the Regents and subject to their appropriate disposition under the direction of this court. The trustees were well aware of this method provided by law for bringing an end to what they considered their grievous difficulties, and were advised of it by the State Education Department, but to have followed it might have meant a possible loss of control under a reorganization or other disposition in legal form. This they hoped to avoid by the scheme which they actually adopted. But even if they had carried the plan out innocently and in good faith, it still would have been illegal.

An instance of this sort which brought unfortunate consequences, although done with the best of intentions and in an honorable manner, is found in *Madison Avenue Baptist Church* v. *Baptist Church in Oliver Street* (46 N. Y. 131). There the trustees of the plaintiff conveyed the property to the defendant as a part of the plan of union of the two churches. The grant was made with the consent of this court, in perfect good faith, the grantee church proceeding to carry out the purposes of the plaintiff by means fully conscientious and sufficient. But the only consideration moving from the defendant there was the assumption of the debts of the plaintiff, which could

be no such benefit, as its property was more than ample security for the indebtedness, and the admission of the members of the plaintiff into the defendant's church was not such a consideration as would in that respect satisfy the law. The Court of Appeals, therefore, upset the judgment below, which sustained such conveyance, notwithstanding the fact that it was apparent " that the plan of union originated in good faith, was fairly and honorably negotiated and consummated, and so far as can be seen, was eminently calculated, to promote both the temporal and spiritual welfare of all concerned." And continuing, the court emphasized the fact that " the security of the real estate of all religious corporations, requires a strict adherence to the statute." *A fortiori*, the reasons for adhering strictly to the statute are far more cogent in the case of public property, particularly in educational spheres, controlled by trustees, whose plans and intentions have been characterized by bad faith. Both the letter and the spirit of the statute were completely disregarded by the trustees, and their line of defense based upon a so-called beneficial result is, therefore, wholly untenable.

Their contention that this action is irregular, because it is a collateral attack upon the legality of the foreclosure, is likewise without merit. Nor is there any weight in the argument that the payment of the interest would have created a preference to the exclusion of other creditors. Even under our rather severe bankruptcy laws in this respect, the payment of interest upon a debt secured by collateral is not necessarily deemed a preference, such as the law looks upon with disfavor. However, regardless of the possibility of remote merit in the highly technical pleas advanced, a court of equity cannot overlook the dominant fact that the great majority of the bonds secured by the foreclosed mortgage was controlled by the trustees, and that their conduct constituted an undoubted breach of trust. For analogy, one might refer to the situations arising in ordinary stock corporations, in which the courts have uniformly intervened for the purpose of preventing a breach of faith on the part of controlling directors. As was said in *Sage* v. *Culver* (147 N. Y. 241, 247): " When it can fairly be gathered from all the allegations of a complaint that the officers and directors of a corporation have made use of relations of trust and confidence in order to secure or promote some selfish interest, enough is then averred to set a court of equity in motion and to require an answer from the defendants in regard to the facts. When it appears that the trustee or officer has violated the moral obligation to refrain from placing himself in relations which ordinarily produce a conflict between self-interest and

45

integrity, there is in equity a presumption against the transaction, which he is required to explain."

This presumption, which in a matter of this kind should obtain even more decisively against trustees in charge of public property, they have utterly failed to explain away. Furthermore, " the law stringently and rigorously forbids to them the use or disposition of the funds or assets of the corporation for their individual enterprises or acquisition, and for any misfeasance or breach of duty or trust resulting in damage to the corporation they are subject to be called to account by the corporation in the appropriate action." (*Pollitz* v. *Wabash R. R. Co.*, 207 N. Y. 113, 124.)

Consequently, the trustees could not put themselves in the position to prevent the payment of interest, and then institute an action in foreclosure practically on their own accord to obtain the entire control of the property. (*Farmers' Loan & Trust Company* v. *New York & Northern R. Co.*, 150 N. Y. 410.) Indeed, the law will not sustain a scheme to " bring about a foreclosure of a mortgage and by a combination, the object of which is to divest the corporation of its property and seek it for itself at the expense of the corporation, its stockholders or its creditors." (*Male* v. *Atchison, Topeka & Santa Fe R. Co.*, 179 App. Div. 87, 91; affd., 230 N. Y. 158.) As already observed, the purchase by Cassidy was concededly with moneys furnished by the trustees. The Community Hospital repaid most of these moneys with interest, and largely out of the funds obtained from the use of the very property.

There is no force in the contention that the plaintiff will be unable to carry out its purpose, because its registration as a medical college was rescinded by the University of the State. This action was not taken until after the faithless trustees had purposely ceased to continue its educational functions, and the rescission involved no revocation of the charter, which is still in effect. But even if it had been revoked, the defendants would still be liable to restitution, so that the constituted authorities as representatives of the people of the State, might make disposition of the property in keeping with law.

The plaintiff is, therefore, entitled to the restoration of its real and personal property illegally and corruptly taken from it. As there must be an accounting from the defendants, it may be appropriate, in order to save unnecessary complications, to indicate a few principles which such a procedure must follow. These are not always easy and must depend upon the particular circumstances controlling in the given case. But the rules laid down in *Madison Avenue Baptist Church* v. *Baptist Church in Oliver Street* (*supra*), which reached the Court of Appeals for the second time and is

reported in 73 New York, 82, are of invaluable aid. At page 96 it is there said: " In a court of equity no general rule for compensation is inflexible. It may mould its relief, and give redress according to the circumstances of each case. When ordinary rules will not apply in the administration of equitable relief, or will work injustice, it must be guided by reason and justice. (*Worrall* v. *Munn,* 38 N. Y. 137; *Morrison* v. *Robinson,* 31 Penn. 456.) "

In this connection, it is important to keep in view the necessity of administering all the relief which the nature of the case and the facts demand, and of bringing such relief down to the close of the litigation between the parties.

Restitution of the real and personal property must come forthwith from the defendant Community Hospital. Any debts of the plaintiff in the form of principal which the defendants have paid must be charged to the former with interest only to the time of the foreclosure sale. The interest upon the mortgages or other debts paid by the defendants from the time the plaintiff was divested of its property, should not be charged against the latter, because it was paid out of the income obtained from the use of such property by the defendants. They should account for all the profits from the conduct and the operation of the property down to the time of the interlocutory judgment. If, as seems improbable, any money should be found due to the defendants or any of them, the court will at the propitious time determine when the amount must be paid, such debt, however, to be a lien against the property. The decree for an accounting shall read against all the trustees except Griesel in respect of whom the action was discontinued. As to Dominick, and Eudora Crump, the complaint is dismissed.

Submit proposed findings and interlocutory judgment in conformity herewith, within five days, on notice.